Filed 7/16/24  P. v. Rocha CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HECTOR JOAQUIN ROCHA,<br><br>Defendant and Appellant. | F085990<br><br>(Super. Ct. No. 1432625)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Stanislaus County.  Shawn D. Bessey, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Hannah Janigian Chavez for Plaintiff and Respondent.

-ooOoo-

In 2013, a jury convicted Hector Joaquin Rocha, Jr. and codefendants Philip Lopez, Jr. and Angel Delvillar of first degree murder, robbery of an inhabited dwelling, and robbery. In a prior appeal, this court affirmed their convictions. (*People v. Delvillar et al.* (May 3, 2018, F069224) [nonpub opn.].) After the Legislature enacted changes in the law governing criminal liability for defendants convicted of murder based on a felony-murder theory, Rocha petitioned for resentencing under Penal Code former section 1170.95 (now section 1172.6).[1] The superior court denied Rocha's petition after an evidentiary hearing. The trial court found the People met its burden of showing beyond a reasonable doubt that Rocha was liable under a still-valid theory of murder, as he was a major participant in the underlying felony who acted with reckless indifference to human life. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Robberies and Murder*[2]

#### *Accomplice Testimony*[3]

Domingo Becerra, Daniel Flores and Aquilles Virgen were all accomplices of appellants, and each testified against them at trial. Becerra testified in exchange for a 25-year-to-life sentence. Virgen was attacked while in custody awaiting trial, prompting him to agree to testify against appellants in exchange for a 15-year-to-life sentence. Flores,

---

[1]     Rocha filed his petition under former section 1170.95, which the Legislature later renumbered as section 1172.6 without substantive change, effective June 30, 2022. (Stats. 2022, ch. 58, § 10.) We refer to section 1172.6 for consistence. Statutory references are to the Penal Code unless otherwise stated.

[2]     Our summary of the facts and the procedural history is taken from the opinion of Rocha's direct appeal following his conviction, *People v. Delvillar et al.*, *supra*, F069224, which affirmed the judgment. We do not rely on this statement of facts in resolving this appeal. For purposes of the summary of the facts, we at times refer to Rocha, Delvillar and Lopez together as appellants.

[3]     Because there was an issue on direct appeal concerning accomplice testimony, the accomplice testimony is set out separately from the remainder of the facts.

while in juvenile hall awaiting trial, also agreed to testify against appellants in exchange for a 10-year sentence and two strikes. The following is their version of the events in question.

On the evening of March 23, 2010, a group of Norteño gang members, coordinated by Johnny Montalvo, also known as "Manos," met at Jamie Cerpa's house in Keyes, near Modesto, to plan a residential robbery. The group, consisting of Rocha, Lopez, Delvillar, Becerra, Flores, and Virgen (at times referred to as "the group"), agreed to rob a house on Thrasher Avenue in Modesto, to steal drugs and money. Montalvo and Cerpa provided the group with firearms, consisting of two or three revolvers, a shotgun, and two pistols, as well as ammunition. The group made masks out of T-shirts and put them over their faces. The group, plus Montalvo and two other Norteños got into two cars: a dark blue Jeep and a red Toyota. Rocha drove the Jeep. The red Toyota was to be used as a "diversion car" in case "things got out of hand" or got into "hot pursuit."

Shortly after midnight, the Jeep and Toyota drove to the house on Thrasher. When the two cars arrived, they found an unexpected SUV parked in the driveway. Inside the SUV were two men and a woman (at times referred to as "the passengers"). Rocha, Lopez, Delvillar, Becerra, Flores and Virgen jumped out of the cars, ran to the SUV, pointed their guns at the passengers and yelled for them to get out of the SUV. The two men got out, but the woman passenger remained in the back seat until one of the group forced her out. Her purse was later taken.

Several of the group took the passengers to the backyard at gunpoint. Becerra wrongly thought one of the passengers lived at the Thrasher house, so he forced him to try to open the front door with his keys. When that did not work, the men took the passenger into the backyard with the others.

Rocha and another of the group broke the back windows of the house and climbed inside, along with Becerra, where they found an occupant. One of the group grabbed the telephone from the occupant's hand, hit him in the face with the butt of his pistol, and

3.

screamed at him, demanding drugs and money. The occupant protested and Rocha responded by firing two shots through the ceiling. One of the group took money from the occupant's wallet in his pants pocket.

At the same time, out in the backyard, others in the group forced the passengers to lie flat on the ground. When Flores heard shots inside the house, he looked over to see what was happening. One of the passengers jumped up and tried to run away but was forced back down by Flores. Becerra, who was in the house, heard the passenger try to flee, so he left the house, walked up to the passenger and shot him three times in the back, killing him.

After the passenger was shot, the group fled the scene as police approached. The group jumped into the Jeep and drove away, followed by a police car. Rocha sped up and the police gave chase. Becerra told the others to give him their guns and masks. All did except Flores, who hid his pistol under the seat. Becerra took the guns and masks and threw them out the window onto the road. By this point, dozens of law enforcement vehicles were involved in pursuit of the Jeep. Eventually, the Jeep was forced to stop when a spike strip blew out the tires. The group leapt out of the vehicle and scattered. All except Delvillar were quickly found and arrested. Delvillar was not arrested until September 17, 2010, in connection with another homicide, and subsequently remanded for the instant offense on September 27, 2011.

Virgen claimed that, while he was in jail with Delvillar, Delvillar told him he hid for a few hours in a laundry room near a house on Parklawn and walked away when everyone left. A large shirt was found in a laundry room on Parklawn Avenue, in Modesto, about 200 feet from where the Jeep stopped in the alley.

Immediately after his arrest, Becerra cooperated with the police and told them where he threw the guns and masks.

4.

*Testimony of Percipient Witnesses to the Crimes*

On March 24, 2010, after midnight, Isaias Pantoja and his two-year-old daughter were asleep on a bed in the living room of their home on Thrasher Avenue in Modesto. Pantoja had rented the house only three weeks earlier and did not know who lived there before he moved in. Pantoja was not a drug dealer, and no one had come by asking to buy drugs. When he heard voices, shouting as if they were fighting or struggling, Pantoja got up and looked out the window and saw five or six people wearing blue and black clothing, their faces covered with handkerchiefs or towels. Four or five of them were carrying weapons – pistols and a rifle – and a strange SUV or truck was parked in the driveway. Three other people were being led to the backyard, including a man who was being dragged and hit or pushed. Pantoja called 911 on his cell phone.

While on the phone, Pantoja heard the kitchen window and several other windows in the back of the house breaking. His daughter was still asleep. Three people came into the kitchen through the window. Pantoja was trying to hold them back while on the phone giving police directions. Pantoja was asking for someone who spoke Spanish when he heard a gunshot. Later, Pantoja saw a bullet hole in the kitchen ceiling. Pantoja saw two guns inside the house. He heard two gunshots – one outside and one inside the house.

One of the men in the house hit Pantoja with his pistol, grabbed him and demanded, in English, "Where is the money?" Pantoja suffered a scratch and bruise on the bridge of his nose and a dark mark under his left eye from being hit with the butt of the pistol. Pantoja did not see the person who shot the gun inside the house, but it may have been the person who struck him.

Pantoja had approximately $110 in his wallet and $600 or $650 in his pants pocket he was going to send to his wife in Mexico. The men took the wallet out of his pants. Pantoja thought the men were in the house for three to five minutes. When they heard

5.

sirens, they took off through the back of the house. Pantoja did not see what happened in the backyard.

While Pantoja was in the house, the people being led from the SUV to the backyard were Corina Vargas, Julio Jimenez and Florentine Soto, whom Pantoja did not know. Vargas testified under an immunity agreement. She testified she was convicted of a misdemeanor hit and run in 2011.

According to Vargas, near midnight on March 23, 2010, she was with her friend Soto, walking to the house on Thrasher to get methamphetamine. As they were walking, Soto waived down Jimenez, driving a green SUV; Vargas did not know the driver. Soto spoke to Jimenez in Spanish, and Vargas and Soto got into the car. It took less than five minutes to drive to the house on Thrasher, where Jimenez parked the SUV in the driveway.

Suddenly, the SUV was surrounded by people wearing black with their faces covered, demanding that the occupants get out of the vehicle. Soto and Jimenez got out; Vargas stayed in the backseat with her purse. One or two people got into the front seat of the SUV, threatened Vargas, and told her to get out of the car and go into the backyard. Vargas saw one of the people with Jimenez at the front doorstep of the house, trying to open the door with his keys. Vargas heard Jimenez say, "No. No. It's not my house."

Two of the men led Vargas to the backyard and told her to get on the ground, where she laid on her stomach, scared for her life. One man stayed with Vargas, about six feet from her with his gun pointed at the ground. He told Vargas to shut up and she would not get hurt. Someone took Vargas's purse while she was on the ground.

While Vargas was still on the ground, she heard two or three gunshots from inside the house, windows breaking, an infant crying, yelling, and then a siren. People fled the house, yelling, "the cops are coming." People were telling Jimenez, who was standing 20 feet from Vargas, to get down. Within seconds, someone shot him. Vargas heard four

or five shots rapidly fired, like the shots from one gun. Vargas only saw the back of the person who shot Jimenez.

After it was quiet, Vargas got up and walked home. She did not call the police, as she was scared. The following day, Detective Grogan came to her house and brought her purse and identification card.

At about half-past midnight, Officer Souza was dispatched to the house on Thrasher. In the driveway was an SUV. Pantoja was in the house with his daughter; he was shaking and had been injured. Some blood spatter was found in the house. In the backyard, Souza found Jimenez, lying on the ground unresponsive, with a wound to the back of his head.

### The Chase

At 12:37 a.m., Officer Lemus heard officers being dispatched to Thrasher and that a dark-colored Jeep was involved. On his way there, Lemus saw a dark blue Jeep followed by a sheriff's patrol car, about a mile and a half from Thrasher. The sheriff activated his siren.

The Jeep accelerated, weaving from lane to lane, and then turned right onto Hatch Road. Another patrol car joined the pursuit. The chase continued through Ceres to an unincorporated area of Modesto. Ultimately, the Jeep turned into an alley where four or five occupants abandoned the vehicle and fled on foot. A total of 15 to 20 patrol vehicles participated in the chase.

### The Arrests

Virgen was arrested in a backyard on Parklawn Avenue. He had a cell phone and a small amount of cash on him. Becerra, who was stuck between a detached garage and the fence of the same backyard, surrendered within 10 to 15 seconds after Officer Murphy shone a light on him. Daniel Flores was discovered, wearing all black, underneath a minivan in the front yard of the house. Rocha, wearing a black sweatshirt and tan pants, was found hiding behind a fence a few houses down. He had a blood stain

7.

on his left knee and dried blood on his left palm.  Lopez, wearing torn black clothing, was arrested in the same block of Parklawn.  The Jeep was found in the alley with the passenger side door open.

At 1:24 a.m., two officers stopped a red Toyota Corolla driven by John Rivera, or "Snoop."  John Montalvo, or "Manos," was in the front passenger seat; Santos Cardenas was sitting behind the driver.  The officers let them go, as they raised no suspicions.

*Search of the Jeep*

A search of the Jeep on March 24, 2010, revealed a Taurus nine-millimeter, semiautomatic firearm loaded with 14 rounds in the magazine underneath the driver's seat.  A pair of black leather gloves were on the front passenger seat; two pieces of black cloth were on the back seat.  Some of the items of clothing and audio CDs had gang writing on them.

*Autopsy*

An autopsy of Jimenez showed tool marks on his forehead matching the pattern from the gun barrel of a .357 recovered by police.  He had bruising and tearing on the back of his head from being hit with the butt of a gun.  He died of two gunshot wounds to the back.

*Other Physical Evidence*

A videotape of the Thrasher house made on March 24, 2010, showed, inter alia, a mattress and child toys on the living room floor.  There was one bullet hole in the kitchen ceiling and another in the ceiling of the room off the kitchen.  A wallet was found next to a pair of pants in the hallway of the second bedroom, with $775 in cash in a pocket.  A number of windows in the house were broken.  The backyard fence was kicked out.

A surveillance video from a gas station in Keyes just after midnight on March 24, 2010, shows an "SUV" and a passenger car pulling into the station.  Within a few minutes time, someone gets out of the right passenger door of the SUV, a second person gets out, the people get back into the vehicle and both cars leave together.

8.

Detective Hicks was notified of the event at 1: 17 a.m. After visiting the Thrasher site, he went to Parklawn Avenue, where he contacted Becerra, whom he knew. Becerra told Hicks, "I fucked up, Hicks." Becerra then helped Detective Hicks find evidence along the chase route – a single barrel shotgun, broken into three pieces, with a live round; red cloth; two loaded .357 revolvers; and a .38. Other items later recovered along the route included clothing, live shotgun shells, a black cotton glove, a white cloth, and a black latex glove.

Delvillar's wallet and a knife were found in the glove box of the red Toyota. A search of Cerpa's house in Keyes revealed six jacketed hollow point, .357-caliber bullets. Also found in the home were handguns containing fired and unfired rounds.

Delvillar was not arrested until September 17, 2010, in connection with another homicide, and was subsequently remanded for the instant offense on September 27, 2011.

*Rocha's Defense*

In his defense, Rocha called Detective Grogan, who interviewed Vargas the day after the robbery. In her interview, Vargas said she had her head down and eyes closed while in the backyard and did not observe what happened. Detective Grogan also interviewed Soto, but law enforcement lost track of him by the time of trial.

Rocha also called several character witnesses, namely his mother, grandmother, father, and a family friend, all testified Rocha did not want to be involved with the gang and was taking night classes to join the military.

Rocha testified in his own defense that, in early 2010, he was going to night school in order to qualify for the military. He claimed he wanted to join the military to get away from the gang culture and his neighborhood. He admitted taking part in several Norteño-related robberies before the Thrasher Avenue incident, but claimed the gang made him do it.

According to Rocha, he got a call on March 23, 2010, from Montalvo asking him to drive some gang members to a house in Keyes. He initially refused, but eventually

agreed because Montalvo insisted and offered to pay for the gas, and he did not want to put himself or his family in danger. Rocha claimed he only learned later that night in Keyes that Montalvo and the others were planning a robbery. Rocha stated he was not given a choice and was ordered to drive his Jeep to the crimes. He tried to get out of it by drinking excessively, but Montalvo got angry and told him to stop drinking. Montalvo gathered about a dozen people at the Keyes location to plan the robbery. He supplied guns to everyone involved in the robbery, as well as makeshift masks made of T-shirts and clothes. Rocha then drove the group to the house on Thrasher, after being given driving directions by Becerra.

When they arrived, another SUV was in the driveway and Becerra ordered the group to go through with the plan. Rocha claimed to be reluctant, but that Becerra demanded he get out of the Jeep. According to Rocha, the group pulled the passengers out of the SUV, were uncertain what to do next, tried to use one of the passenger's keys for the front door and, when that did not work, took the passengers as hostages into the backyard. Rocha claimed Delvillar ordered him to enter the house through the windows to retrieve the drugs and money. Once in the house, thinking the occupant Pantoja was running for a gun, Rocha fired a shot into the ceiling to stop him. He then fired another shot into the ceiling to silence an argument between Delvillar and Pantoja. Rocha claimed Delvillar took the occupant into another room and then returned with the occupant bleeding from his face. Delvillar suddenly panicked and told Rocha they needed to leave. The two of them exited through the windows and ran for the Jeep. Rocha claimed he did not see a body in the backyard.

Once the group was back in the Jeep, Becerra commanded Rocha to drive. When he saw an officer behind him, he tried to pull over, but Becerra grabbed the steering wheel and told him to keep driving. The others in the Jeep encouraged him to drive faster. While they were speeding, Becerra asked for everyone's masks and guns. The Jeep was eventually partially disabled when it hit spike strips. The group jumped out of

10.

the vehicle, but Rocha was caught within minutes. He claimed he first learned someone had been shot at the Thrasher house when he was being questioned by the police. Rocha insisted that he did not do anything for the benefit of the Norteño gang on that night, but only acted out of fear that he would be killed if he refused.

### Lopez's Defense

In his defense, Lopez called Detective Hicks, who had spoken to Becerra about the firearms used in the robbery. Becerra could not be certain which person had which gun, two of which were very similar looking, and the shotgun was broken when found. Becerra contradicted himself several times regarding which guns Rocha and Lopez were carrying.

### Delvillar's Defense

Delvillar did not present additional witnesses.

## The Charges, Trial and Prior Appeal

On September 21, 2011, an indictment was filed charging Rocha, Lopez, Delvillar, Virgin, and Cerpa with the first degree murder of Julio Jimenez (§ 187, subd. (a)); robbery of an inhabited dwelling (§ 212.5, subd. (a)); and robbery of Corina Vargas (§ 211). As to each defendant, it was alleged that the murder was committed during the course of a robbery and each was a principal in the robbery (§ 189); that the robberies were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(l)); and that a principal in the robberies personally discharged a firearm causing the death of Jimenez (§§ 12022.7, 12022.53, subds. (d), (e)(l)). And, as to Lopez, it was alleged that he was at least 16 years old at the time of the offenses (Welf. & Inst. Code, § 707, subd. (d)(l)).

Rocha, Lopez, Delvillar and Cerpa were convicted as charged.[4] The trial court sentenced each to a total term of 80 years to life, consisting of 75 years to life for the

---

[4] As noted above, Virgin testified against Rocha, Lopez, Delvillar and Cerpa at trial in exchange for a 15-year-to-life sentence. Cerpa filed a separate appeal.

murder and firearm enhancements, plus a total of five years for the robberies. Various fines and fees were imposed.

On May 3, 2018, in case No. F069224, this court, inter alia, affirmed the judgment as to Rocha, except to remand for the trial court to consider whether to exercise its discretion under section 12022.53, subdivision (f) to strike or dismiss firearm enhancements under section 12022.53.[5]

### Rocha's Petition for Resentencing

On March 26, 2019, Rocha, in propria persona, filed a form petition under section 1172.6. Rocha checked the boxes on the form indicating an indictment was filed against him that allowed the People to proceed under a theory of felony murder; he was convicted of murder pursuant to the felony-murder rule; he could not now be convicted of murder because of changes to sections 188 and 189; and he was not the actual killer, did not, with the intent to kill, aid or abet the killer in the commission of murder in the first degree, and was not a major participant in the felony who acted with reckless indifference to human life.

On May 24, 2019, the People filed a response and motion for summary denial of the petition on various grounds, including the unconstitutionality of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). On June 26, 2020, the People filed a brief arguing Rocha had failed to make a prima facie showing of eligibility for relief because he was a major participant in the robbery who acted with reckless indifference to human life, and he was a direct aider and abettor of the malice murder. Exhibits attached to the opposition included some trial testimony, jury instructions, and completed verdict forms.

On May 7, 2021, Rocha filed a brief supporting his petition, arguing an order to show cause (OSC) should be issued. He also filed supplemental points and authorities, arguing that an evidentiary hearing was required to determine if he was a major

---

[5] The determination of the firearm enhancements is not part of the current appeal.

participant in the felony that led to the death of the victim and whether Rocha acted with reckless indifference to human life.

On June 29, 2021, the People filed a supplemental brief conceding that issuance of an OSC might be necessary.

On January 31, 2022, the trial court stated that the decision on the firearm enhancements would trail the decision on the resentencing petition. The trial court found a prima facie showing had been made that Rocha was convicted under the felony-murder rule and the issue was whether he was a major participant who acted with reckless indifference to human life.

On November 21, 2022, the People filed a brief in response to the OSC, arguing Rocha was a major participant who acted with reckless indifference to human life and Rocha directly aided and abetted an implied malice murder. Exhibits were attached, including portions of the trial transcript, jury instructions, verdicts, as well as this court's nonpublished opinion in *People v. Delvillar et al.*, *supra*, F069224.

Rocha filed a brief on November 28, 2022, arguing primarily that he did not act with reckless indifference to human life in the underlying felony.

On March 21, 2023, the trial court held an evidentiary hearing, in which it took judicial notice of the reporter's transcript in case No. F069224. At the People's request, certain trial exhibits were admitted without objection from Rocha's counsel. Rocha's counsel requested the trial court again review the "crime scene video." No further evidence was presented.

The People then argued the facts of the case, particularly the fact that Rocha drove the vehicle to the home where the robberies took place, that he was armed with a loaded gun and was wearing black with a covering over his face when he did so, that he broke into the home and fired his weapon several times. The People argued that the commotion inside the home alerted the others outside the home that the home invasion was not going

as planned and led to the shooting and death of victim Jimenez, who was outside in the backyard of the home.

The People argued further that Rocha could still be convicted of murder under the revised felony-murder rule, as he was a major participant who acted with reckless indifference to human life, as evidenced by the trial transcript in this case and the factors outlined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). As to factors showing Rocha was a major participant, the People noted Rocha's part in planning the underlying crime, which Rocha admitted at trial, although he claimed he was under duress when he did so. While there was no indication that Rocha supplied the weapons for any of his codefendants or himself, he did know that the firearm he had was loaded. The People argued further that Rocha was very aware of the danger of the crime before embarking on it, having stated at trial that, " 'A dope dealer is not going to easily give up his dope or money.' " Further Rocha was present during the entire event, having driven the other participants, all armed, to the targeted home, violently confronting the unexpected individuals in the driveway when they arrived, entering the occupied home, and firing his gun in the house, leading to more chaos outside and the eventual killing of Jimenez. Furthermore, Rocha did nothing to mitigate the situation. Finally, the People argued that Rocha acted with reckless indifference in that he was aware of and was willingly involved in the violent manner in which the offense was committed, especially with four or more of the participants armed and ready to use lethal force, creating a significant risk of death by his actions.

Defense counsel argued Rocha was eligible for resentencing because there was no evidence Rocha's participation in the home invasion portion of the crime was the same action that led to the shooting, outdoors, of Jimenez. Counsel argued that there was no evidence that Rocha was the actual killer or that he intended to kill or aided and abetted the actual killer. As argued by counsel, Rocha was a major participant in the home invasion robbery, but not in the action that took place separately outside the home in the

14.

backyard. Counsel argued further that, while Rocha may have been present when the crime was planned, there was no evidence he participated in the planning. Rocha also followed the instructions not to shoot anyone; when he did use his firearm, he shot into the ceiling, which counsel claimed showed Rocha's attempts to mitigate the situation. Counsel also argued Rocha had no knowledge of anyone being shot fatally and that he only learned of the victim's death when questioned by the police.

Defense counsel argued that Rocha did not show reckless indifference to human life as there were "no separate intermediate steps between Mr. Rocha going into the house and effecting the home invasion and what was happening outside." Counsel described the actions of the killer (not Rocha) as perpetrated by people "who abandoned the work of the home invasion robbery and proceeded to handle the distraction that they saw when the car drove up at the same time."

In rebuttal, the People argued there were not two different crime scenes, but that the crime scene was "the entire Thrasher property." The People also refuted defense counsel's argument that Rocha, while inside the house, did not know what was going on outside, as he had been present when the people in the driveway were dragged out of their vehicle, assaulted, and threatened to be killed. Finally, the People argued that there was a direct connection between Rocha firing his gun in the house and the chaos that ensued outside after the victim jumped up, tried to flee, but was shot.

Following argument by the parties, the trial court issued an order denying Rocha's petition. The trial court determined that Rocha was part of the planning of the home invasion robbery, that he was armed and drove a vehicle with fellow defendants to the scene of the crime, and that he knew robbery involved a grave risk of death. The court found beyond a reasonable doubt that Rocha was a major participant who acted with reckless indifference to human life.

15.

## DISCUSSION

Rocha contends there was insufficient evidence to support the trial court's denial of his section 1172.6 petition regarding the murder. Primarily, he contends there was insufficient evidence that he acted with reckless indifference to human life. We disagree.

## I.    SECTION 1172.6

Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*).) The Legislature "significantly narrowed the scope of the felony-murder rule" in Senate Bill 1437. (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*); see *People v. Curiel* (2023) 15 Cal.5th 433, 440, 448–449.)

Senate Bill 1437 also added what is now section 1172.6. (Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10; see § 1172.6, subd. (a); *Lewis, supra,* 11 Cal.5th at p. 959; *Strong, supra,* 13 Cal.5th at p. 708.) Section 1172.6 provides a mechanism by which a person convicted of murder under the former law may be resentenced if he or she could no longer be convicted of murder because of the changes to section 188. (*Strong, supra*, at p. 708; see generally *Gentile, supra,* 10 Cal.5th at p. 843; *Lewis, supra*, at pp. 959–960.) Once a petitioner establishes a prima facie case for relief and the superior court issues an OSC, the matter proceeds to an evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (*Strong,* at pp. 708–709; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to section 188 and 189, the petitioner is ineligible for relief under section 1172.6. (*Strong,* at pp. 708–709; *Vargas,* at p. 951.)

16.

In Senate Bill No. 775 (2021–2021 Reg. Sess.), the Legislature amended the statute, effective January 1, 2022, to clarify, among others, what evidence is admissible at the evidentiary hearing. (Stats. 2021, ch. 551, § 2.) The Evidence Code governs the admission of evidence at the hearing, "except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) Courts have held that, "by *allowing* consideration of ' "the procedural history" ' in a prior appellate opinion, the Legislature intended to *prohibit* consideration of 'the factual summar[y]' in a prior appellate opinion." (*People v. Vance* (2023) 94 Cal.App.5th 706, 713, citing *People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*).)

At the evidentiary hearing stage under section 1172.6, subdivision (d), the trial court must act as an independent factfinder to determine whether the defendant is guilty of murder beyond a reasonable doubt under current law. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; § 1172.6, subd. (d)(3).) The plain language of subdivision (d) allows the trial court to consider evidence and testimony admitted at a prior trial, so long as it would still "be admissible under current law." (*People v. Cody* (2023) 92 Cal.App.5th 87, 104.) Subject to the parties' right to submit additional evidence, this procedure allows "trial judges to decide the critical factual questions based—at least in some cases—on a cold record." (*Clements, supra,* 75 Cal.App.5th at p. 297.) The court's role is not to decide whether substantial evidence supports a murder conviction—it is to act as the factfinder by resolving factual disputes and adjudicating the petitioner's guilt beyond a reasonable doubt under current law. (See *Strong, supra,* 13 Cal.5th at p. 720 ["a court determination that substantial evidence supports a homicide conviction is not a basis for denying resentencing after an evidentiary hearing"]; § 1172.6, subd. (d) ["A finding that there is substantial evidence to support a conviction for murder,

attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing"].)  In the absence of evidence of the contrary, we ordinarily presume that the trial court knew and applied the correct statutory and case law.  (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

## II. SUFFICIENCY OF EVIDENCE

### *Standard of Review*

On appeal from an order denying a section 1172.6 petition after an evidentiary hearing, we review the trial court's fact finding for substantial evidence.  (*Clements, supra,* 75 Cal.App.5th at p. 298; *People v. Williams* (2020) 57 Cal.App.5th 652, 663.)  We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicholas* (2004) 34 Cal.4th 614, 657–658.)  Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt. (*Ibid.*)

### *The* Banks *and* Clarks *Factors*

In *Banks, supra,* 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th 522, the California Supreme Court set forth factors relevant to determining whether a defendant is a major participant in a felony who acted with reckless indifference to human life.

The *Banks* factors are relevant to deciding "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant."  (*Banks, supra,* 61 Cal.4th at p. 794.)  The factors include:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the

18.

defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The *Clark* factors are relevant to determining whether a defendant acted with reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at pp. 618–623.) Relevant factors include: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677, citing *Clark*, at pp. 618–623.) At its core, "[r]eckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death' " (*In re Scoggins*, at p. 676, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157 (*Tison*), and "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the [appellant] does not specifically desire that death as the outcome of his actions." (*Clark*, at p. 617.)

No single *Banks* or *Clark* factor is determinative—or even necessary. (*Banks, supra,* 61 Cal.4th at p. 803; *Clark, supra,* 63 Cal.4th at pp. 618, 621–623.) Instead, courts are to assess the totality of a defendant's culpability within a "spectrum" established by two United States Supreme Court cases. On one end is *Enmund v. Florida* (1982) 458 U.S. 782, in which the defendant was the classic getaway driver who was a " 'minor actor in an armed robbery, not on the scene, who neither intended to kill nor was

found to have had any culpable mental state.' " (*Banks*, at p. 800.) On the other end of the spectrum is *Tison, supra,* 481 U.S. 137, in which the defendants helped convicted murderers escape from prison, provided weapons, and stood by as their confederates debated killing, then killed, an innocent family of four. (*Banks*, at pp. 801–803; *Strong, supra,* 13 Cal.5th at p. 705 [discussing the *Tison-Edmund* spectrum of culpability].)

### *The Court's Ruling*

In denying Rocha's petition the trial court, in a lengthy analysis, began by stating that it had reviewed the trial transcripts and testimony of witnesses and had a "pretty good understanding of the facts related to, one, what the verdict was in the case by the jury, and, two, for making my own decision." It then found Rocha was a major participant in the underlying felony, the home invasion robbery, due to his being an active gang member and "being part of the planning" of the crime; "freely and voluntarily" arming himself with a loaded firearm; being the "lead driver" and driving the other participants, also with loaded firearms, to the site where the robbery was to take place; disguising himself with a hoodie so as not to be recognized; stopping for gas before finding the targeted home; and once at the site, first driving to the back and then front of the house.

The trial court stated that, while the goal was the home invasion robbery, the occupants of the SUV in the driveway surprised the group, which immediately turned into assaulting the occupants, taking their keys from them, and them being pushed to the ground. The trial court stated that, while the testimony did not state whether Rocha hit any of the three occupants of the vehicle, he participated with the others by "either being a body showing force, being armed, and using force." Rocha's goal was then to get into the house where they thought there was drugs and money. After breaking into the house, Delvillar and Rocha confronted the occupant, Pantoja and, after, Delvillar hit Pantoja with his weapon, Rocha fired his into the ceiling, the sound of which then set off the reaction outside with the SUV occupants and Becerra killing one of the occupants trying

20.

to escape. As stated by the trial court, "So when you talk about major a participant – clearly, Mr. Rocha was a participant."

The trial court then stated that the "crux of the case is did [Rocha] act himself with reckless indifference to human life? And because he transported the armed individuals and knowing that they were armed, knowing that they are gang members and being a gang member himself – that heightens his awareness that there's a possibility of violence." The trial court found that the testimony at trial, by Becerra, Virgen and Rocha, all verified that they were armed because they had a "heightened understanding that this could turn violent." The trial court concluded by stating:

> "[Section] 189 specifically talks about that home invasion, robbery, and, you know, what is the liability. And if you act with reckless indifference to human life in that home invasion robbery, then you can be liable for that murder under the current status of the law.
>
> "And by firing a gun in a heated situation where everybody is armed and people have been beaten down already and purses have been take[n], keys have been taken, doors have been busted down, windows have been broken out – I don't see anything that would indicate that he was wasn't acting in reckless indifference to human life because he part and parcel part of that violation to the point of breaking into the house, physically breaking into the house, and receiving injuries because he broke in.
>
> "So I just don't see where, under today's standard, that a jury would have not convicted him. But for my finding – I'm the trier of fact – that I find that those elements have been satisfied beyond a reasonable doubt. Therefore, your petition is denied and the sentence previously remains imposed …."

*Major Participant*

We find substantial evidence supports the trial court's finding that Rocha was "clearly" a major participant in the underlying felony. The trial transcript contained substantial evidence indicating Rocha, an active gang member, was involved in the planning of the home invasion robbery, he was armed with a loaded weapon and put on a

21.

disguise to avoid recognition, and he drove the vehicle with fellow armed participants to the scene of the home invasion.

### Reckless Indifference to Human Life

Applying the *Clark* factors, and considering the totality of the circumstances, substantial evidence also supports the finding that Rocha acted with reckless indifference to human life. The major participant and reckless indifference factors " 'significantly overlap' " in that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark, supra,* 63 Cal.4th at pp. 614–615, quoting *Tison, supra,* 481 U.S. at p. 153.) Consequently, the trial court's factual finding that Rocha was a major participant of the home invasion robbery is supportive of the court's additional factual finding that Rocha acted with reckless indifference to human life. (*People v. Cody, supra,* 92 Cal.App.5th at p. 113; see also *Tison, supra,* 481 U.S. at p. 158, fn. 12 [a defendant's status as a major participant in the underlying felony will "often provide significant support for [] a [reckless indifference] finding"].)

The trial court noted that the "crux of the case" was whether Rocha acted with reckless indifference to human life. The trial court found Rocha's act of transporting armed individuals, knowing both that they were armed and gang members, heightened his awareness that there was a possibility of violence. The trial court noted not only Becerra and Virgen's testimonies, but Rocha's own testimony, that violence was going to be expected and any type of resistance was going to be met with violence, which was why they were armed. As stated by the trial court, the group "start[ed] off with a heightened understanding that this could turn violent." (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 [home invasion robbery of a drug dealer posed obvious risk of lethal violence evidencing reckless indifference to human life].)

The trial court also found that Rocha's act of firing his weapon in a situation "where everybody is armed and people have been beaten down already and purses have

been take[n], keys have been taken, doors have been busted down, windows have been broken out – I don't see anything that would indicate that he was wasn't acting in reckless indifference to human life because he part and parcel part of that violation to the point of breaking into the house, physically breaking into the house, and receiving injuries because he broke in."

### *Rocha's Age and Intoxication at the Time of the Offense*

Finally, Rocha contends the trial court should have considered his youth and intoxication at the time of the robbery in deciding whether he acted with reckless indifference to human life. Because Rocha's counsel did not argue either factor in his papers in support of Rocha's petition or orally before the superior court, Rocha contends that, if we deem the issue forfeited, he received ineffective assistance of counsel. We need not address Rocha's ineffective assistance of counsel claim because we conclude, on the merits, that, if there was any error, it was harmless on the facts of this case.

Numerous cases have addressed the relevance of a defendant's youth when conducting an analysis under *Banks, supra,* 61 Cal.4th 788, and *Clark, supra,* 63 Cal.4th 522. For instance, the appellate court in *People v. Harris* (2021) 60 Cal.App.5th 939, remanded the matter for a resentencing hearing under subdivision (d) of former section 1170.95 because the record of conviction did not establish as a matter of law that the defendant, 17 years old at the time of his arrest, was ineligible. (*Harris,* at pp. 944, 959–961.) In its discussion of the major participation requirement, the court commented: "[G]iven [the defendant's] youth at the time of the crime, particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that [the defendant] was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants.' " (*Id*. at p. 960.)

And in *In re Moore* (2021) 68 Cal.App.5th 434 (*Moore*), the appellate court found insufficient evidence that the defendant acted with reckless disregard to human life "upon

consideration of the factors identified in *Clark* together with [the defendant's] youth at the time of his offenses." (*Id*. at p. 451.) First, many of the *Clark* factors suggested that the defendant "did not act with the requisite reckless indifference to human life." (*Moore*, at p. 452.) Second, citing *Harris*, the court concluded that, even if the evidence supported "a finding of reckless indifference for an adult, it is not sufficient to establish that [the defendant], who was 16 at the time of the shooting, had the requisite mental state." (*Moore*, at p. 453.) Rather, concluding that "the 'hallmark features' of youth – 'among them, immaturity, impetuosity, and failure to appreciate risks and consequences' – are arguably more germane to a juvenile's mental state than to his or her conduct" (*id*. at p. 454), the appellate court held that "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life." (*Ibid.*) When the court viewed the evidence through "the lens of [the defendant's] youth," it could not "conclude beyond a reasonable doubt that [the defendant] was subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Ibid.*, fn. omitted.)

And in *People v. Jones* (2022) 86 Cal.App.5th 1076 (*Jones*), defense counsel argued at resentencing that the defendant was 20 years old at the time of the crime and " 'immature.' " (*Id.* at p. 1091.) Counsel asked the court to consider the defendant's youth on the basis that " 'recklessness is a hallmark of youth, but it does not alone demonstrate a reckless disregard for the value of human life.' " (*Ibid*.) In addition, a defense sentencing report contained in the record of conviction asserted that Jones had a "traumatic and violent" upbringing as well as under-diagnosed mental health and substance abuse issues, and "appeared to be impulsive rather than criminally sophisticated." (*Ibid.*) When denying resentencing, however, the trial court failed to discuss the defendant's youthful age or maturity level. (*Ibid.*) The *Jones* court determined that, given the recentness of *Harris* and *Moore*, it could not assume that the trial court had followed the law and considered the defendant's youth in its *Banks/Clark*

analysis. (*Jones, supra,* 86 Cal.App.5th at p. 1092.) It held that "[i]n addition to the *Banks* and *Clark* factors, a defendant's youthful age must be considered." (*Id.* at p. 1088, fn. 7.)

Rocha, who was 20 years old at the time of the crime, provides no authority for the proposition that his level of intoxication should also have been considered.[6] However, as explained in *Banks, Clark,* and *Scoggins,* in determining whether a defendant acted with reckless indifference to human life, we must "consider the totality of the circumstances." (*Banks, supra,* 61 Cal.4th at p. 802.) Thus, the factors identified in *Banks* and *Clark* are "nonexclusive" (*In re Taylor* (2019) 34 Cal.App.5th 543, 552) – with " '[n]o one' " factor being " 'necessary' " or " 'necessarily sufficient.' " (*Clark, supra,* 63 Cal.4th at p. 618.) For purposes of our analysis here, we will address Rocha's claim that the trial court did not address either factor – youth or intoxication.

Generally, as Rocha concedes, we presume the lower court was aware of, and followed, the law while performing its duties. (*Jones, supra,* 86 Cal.App.5th at p. 1092.) Given this presumption, in "the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Ibid.*) Instead, we presume the lower court "duly considered the evidence presented to it." (*Ibid.*) That presumption applies here, as the evidentiary hearing was held well past the time numerous cases addressing a defendant's youth in the context of *Banks* and *Clark* factors had been decided. (Cf. *People v. Oliver* (2023) 90 Cal.App.5th 466, 488–490 (*Oliver*) [noting it was unlikely the superior court knew to consider the petitioner's youth

---

**6**      Specifically, Rocha, testified at trial that he began "really drinking" at the Keyes house so that he could get completely drunk and pass out, to avoid driving the Jeep to the robbery, but that he was told by Montalvo stop drinking. Rocha testified that he was not as drunk as when he passed out before, but he was "really drunk." Flores testified that Rocha appeared drunk, "[n]ot that drunk" and he was still able to walk, although his eyes were bloodshot, and he was not in the "right state of mind." Becerra testified that he did not know if Rocha had been drinking, but he "looked all fucked up."

where the resentencing hearing was held before *Harris* and *Moore* were decided]; *Jones,* at pp. 1091–1092 [declining to presume superior court considered the petitioner's youth where the resentencing hearing was held before, inter alia, *Moore* was decided].)

In any event, even assuming, arguendo, that the trial court failed to adequately address Rocha's age and level of intoxication, we find any such error under the specific circumstances of this case harmless. As stated in *Oliver, supra*:

> "[W]e acknowledge the trajectory of the legislation and case law recognizing the psychological and neurological differences between youthful and adult offenders, which both lessen the culpability of the young and increase the likelihood of their rehabilitation. However, we leave for another day the task of establishing the parameters of our colleagues' holding in *Jones*. Thus, for example, we need not articulate the appropriate definition of 'youthful' in this context. Nor do we determine whether it is incumbent upon a trial court to expressly consider youth as part of its *Banks/Clark* analysis even when age is not raised by the defense. Rather, we conclude that, even if the trial court was required to expressly consider [the defendant's] youth, any such error in this regard is harmless under the specific circumstances of this case." (*Oliver, supra,* 90 Cal.App.5th at pp. 488–489, fn. omitted.)

The defendant in *Oliver* was 23 years old at the time of the crime. The court in *Oliver* noted that the presumption of immaturity weakens as a defendant approaches 26, and that "case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*Oliver, supra,* 90 Cal.App.5th at p. 489.) The trial court in *Oliver* found no evidence that the defendant's criminal behavior was motivated by either of these two factors. (*Ibid.*)

While the record here does not reflect – one way or the other – whether the trial court considered Rocha's age or level of intoxication at the time of the crime, both Rocha's age (20 years old) and his claim of intoxication are evident in the trial transcript, which the trial court stated it had reviewed, as evident by its lengthy analysis in issuing its denial of the petition.

26.

Here, too, we are not presented with a situation where a youthful offender was swept up in circumstances beyond his control that led to an unintended death. The facts do not indicate that the decision to commit the home invasion robbery was spontaneous or that the motive to do so arose from mere happenstance. Rather, the evidence shows that Rocha was aware – from planning, arming himself with a loaded weapon, disguising himself, driving the vehicle with other armed participants – that any one of the participants was willing to fire his weapon in further pursuit of the drugs and money they sought inside the home on Trasher. This made Rocha "subjectively aware that his actions created a graver risk of death than any other armed robbery" (*Moore, supra,* 68 Cal.App.5th at p. 454, fn. omitted), but he nevertheless actively participated. (*In re Harper* (2022) 76 Cal.App.5th 450, 467–472 [habeas corpus petition denied where defendant's youth, even if a factor, did not change his culpability because the evidence showed he knew the plan was to kill the victim]; see also *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595 ["[E]very 18 year old understands bullet wounds require attention. The fact of youth cannot overwhelm all other factors"].)

As for peer pressure, while Rocha claimed he was pressured, the trial court, as the trier of fact, was allowed to discredit Rocha's self-serving testimony. (Compare *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 [evidence to support a finding that the defendant was influenced by peer pressure, including fear of death if he did not participate in the carjacking]; see also *Jones, supra,* 86 Cal.App.5th at p. 1093 ["In *Harris* and *Moore*, the concern was that a juvenile was vulnerable to the influence of others and could fail to appreciate the dangers of his activities and his cohort's actions"].)

Finally, Rocha has failed to present on appeal or in the court below *any* specific support for the proposition that his level of maturity somehow lessened his culpability for this murder. The defendant in *Jones*, in contrast, presented evidence of his "traumatic and violent" upbringing as well as under-diagnosed mental health and substance abuse

27.

issues, and "appeared to be impulsive rather than criminally sophisticated." (*Jones, supra,* 86 Cal.App.5th at p. 1091.)

Under the circumstances of this case, we see no reasonable likelihood that the trial court would have reached a different conclusion had it focused more specifically on Rocha's age or level of intoxication. It was reasonable for the trial court to find that Rocha knew the risk inherent in participating in a home invasion robbery. Rocha was thus ineligible for resentencing under section 1172.6. Only where " ' "upon no hypothesis whatever is there sufficient substantial evidence to support the [judgment]" ' " is reversal warranted. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) Rocha does not meet this standard.

## DISPOSITION

The trial court's order denying Rocha's petition for resentencing under section 1172.6 is affirmed.

FRANSON, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.